Jalene Ortez ALLEN and Lynn Allen,
Plaintiffs and Appellants,

v.

Raymond ORTEZ, aka Ray Ortez, Sheila
Ortez, Lucinda A. Rasmussen, Karen
Platis, and Primary Children's Medical
Center, a part of Intermountain Health
Care Corp., a corporation, Defendants
and Appellees.

No. 890098.

Supreme Court of Utah.

Dec. 6, 1990.

George H. Searle, Salt Lake City, for plaintiffs and appellants.

Charles W. Dahlquist, II, Sherene T. Dillon, Salt Lake City, for defendants and appellees.

ZIMMERMAN, Justice.

Plaintiffs Jalene Ortez Allen and Lynn Allen appeal from an order of the Third Judicial District Court granting summary judgment in favor of defendants Lucinda Rasmussen, Karen Platis, and Primary Children's Medical Center and dismissing plaintiffs' libel action. The trial court held that all three of the allegedly libelous communications were entitled to qualified immunity under Utah's child abuse reporting statutes. *See* Utah Code Ann. §§ 62A-4-501 to -514 (1988).[1] Additionally, the court held that two of these communications also were absolutely privileged under the common doctrine that privileges statements made in the course of a judicial proceeding. We disagree with both conclusions and reverse and remand.

M, a minor, was born February 8, 1981. M's parents, Jalene Ortez Allen and Raymond Ortez, were divorced on March 17, 1983. In December of 1984, a few months before his fourth birthday, M visited his mother at her home. Later in December, M's father suspected sexual abuse and took M to Primary Children's Medical Center ("Primary Children's") for a physical exam-

ination. Although Primary Children's found no physical evidence of abuse, it filed a report of possible sexual abuse with the Murray City Police Department. Primary Children's also referred the Ortezes to its outpatient psychiatric clinic for psychological evaluation.

On January 24, 1985, Lucinda Rasmussen, a clinical social worker and an employee of Primary Children's, interviewed and evaluated M. Rasmussen concluded that M had been abused. At the request of M's father, Rasmussen then sent a letter to the mayor of Murray City. The letter, dated February 6, 1985, detailed her conclusions concerning the abuse. The letter specifically stated that M's stepfather, Lynn Allen, and his mother, Jalene Allen, had sexually abused M. Rasmussen then saw M in therapy for a short period of time.

In April of 1987, M's father again became concerned and took M to Primary Children's for further evaluation. Rasmussen saw M for therapy in May of 1987 and again concluded that M had been abused by both his mother and his stepfather.

Also during May of 1987, M's mother filed a petition for modification of her custody and visitation rights, a petition that M's father opposed. Acting at the father's request, Rasmussen prepared and sent more letters detailing her conclusions regarding the claims of sexual abuse. This time letters were sent to the father's attorney, Rulon R. Price, and to Sandra N. Peuler, the domestic relations commissioner before whom the modification petition was pending. These letters stated quite conclusively that M's mother and stepfather had abused M. Rulon Price had not requested that Rasmussen send these letters, and nothing in the record indicates that Commissioner Peuler requested them.

Two weeks later, the Allens (M's mother and stepfather) filed suit against the Ortezes (M's father and stepmother), Lucinda Rasmussen, supervising social worker Kar-

---

1. These statutes were formerly codified under Utah Code Ann. §§ 78-3b-1 to -16 (1987). For purposes of this appeal, the minor changes implemented by the amendments are irrelevant.

en Platis, and Primary Children's ("defendants"), claiming that each of the three letters sent by Rasmussen contained libelous statements. Defendants moved to dismiss on two grounds. First, they claimed that Utah's child abuse reporting statutes, sections 62A–4–501 to –514 of the Code, grant them immunity for all three letters. Specifically, they relied upon section 62A–4–510, which provides that any person "participating in good faith in making a report" pursuant to section 62A–4–503 is immune from any resulting liability.[2] Utah Code Ann. § 62A–4–510. Second, they claimed that no libel charge could be based on the letters sent to Mr. Ortez's attorney and to Commissioner Peuler because the common law privileges statements made by witnesses and other participants in the course of a judicial proceeding.

Initially, the district court denied the motion, explaining that there were unresolved factual questions concerning whether the reports were made in good faith, as required by section 62A–4–510.[3] Defendants then filed Ms. Rasmussen's affidavit, which stated that all her reports were made in good faith, and renewed their motion for summary judgment. Plaintiffs did not file any responsive affidavits contradicting the assertion of good faith.

This time, the district court granted summary judgment for defendants. The court specifically found that all three letters were written in good faith and fell within Utah's child abuse reporting statutes. It therefore found that all defendants were eligible for the immunity provided for such reports in section 62A–4–510. The court also found that the letters sent to the attorney and the commissioner are "absolutely privileged." We conclude that in making this statement, the district court was relying on the common law privilege. Therefore, we have both the statutory and common law privilege questions before us.

We begin by noting the applicable standard of review. Summary judgment is appropriate only when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *e.g.*, *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990); *Utah State Coalition of Senior Citizens v. Utah Power & Light*, 776 P.2d 632, 634 (Utah 1989). On appeal from summary judgment, we give no particular deference to the trial court's conclusions of law and review them for correctness. *E.g.*, *Landes*, 795 P.2d at 1129; *Madsen v. Borthick*, 769 P.2d 245, 247 (Utah 1988).

2. Section 62A–4–503 requires any person who reasonably suspects that a child is being abused to report immediately to one of three listed agencies. It provides in relevant part:

   (1) Whenever any person ... has reason to believe that a child has been subjected to incest, molestation, sexual exploitation, sexual abuse, physical abuse, or neglect, or who observes a child being subjected to conditions or circumstances which would reasonably result in sexual abuse, physical abuse, or neglect, he shall immediately notify the nearest peace officer, law enforcement agency, or office of the division [of Family Services within the Department of Social Services].

Utah Code Ann. § 62A–4–503 (1989) (formerly Utah Code Ann. § 78–3b–3).

   Section 62A–4–510 of the Utah Code provides:

   Any person, official, or institution participating in good faith in making a report, taking photographs or X-rays, or taking a child into protective custody pursuant to this part, is immune from any liability, civil or criminal, that otherwise might result by reason of those actions.

Utah Code Ann. § 62A–4–510 (1989) (formerly Utah Code Ann. § 78–3b–9). In connection with the reporting requirements, the statute also states that any person who is required to report suspected child abuse who wilfully fails to do so is guilty of a class B misdemeanor. *See* Utah Code Ann. § 62A–4–511 (1989) (formerly Utah Code Ann. § 78–3b–10).

3. In denying the motion, the court actually stated that there were factual questions concerning whether the reports were made in good faith. Later, in granting defendants' motion for summary judgment, the court stated that the reports were prepared pursuant to section 78–3b–13 (currently codified at section 62A–4–513) and were therefore absolutely privileged. Because this section deals only with the confidentiality of reports after they are prepared and other unrelated topics, we assume that the court also relied on sections 78–3b–3, regarding preparation of the reports, and 78–3b–9, regarding immunity (currently codified at sections 62A–4–503 and 62A–4–510 respectively).

We first consider the trial court's ruling that defendants are entitled to the qualified immunity provided by the child abuse reporting statute. In interpreting the scope of the statute, it is important to keep in mind that it merely provides a privilege to engage in what otherwise would amount to defamation. We must not give the statute a broader interpretation than is necessary to effectuate its purposes. To do otherwise would be to sanction potentially widespread libel.

Section –503 of the child abuse reporting statute requires any person with reason to believe that a child is being abused to "immediately notify the nearest peace officer, law enforcement agency, or office of the division [of Family Services within the Department of Social Services]." Utah Code Ann. § 62A–4–503 (1989).[4] A failure to make a report as required by section –503 is punishable as a class B misdemeanor. *See* Utah Code Ann. § 62A–4–511 (1989). Section –510 provides that "any person ... participating in good faith in making a report ... pursuant to this part, is immune from any liability, civil or criminal, that otherwise might result by reason of those actions." Utah Code Ann. § 62A–4–510 (1989).

We find no ambiguity in the operation of these sections. They reflect a coherent scheme. Section –503 sets out the circumstances under which one must report suspicions of child abuse, section –511 provides the penalties for failing to comply with section –503, and section –510 immunizes those who comply with the reporting requirements of section –503. The narrow purpose of this scheme is to facilitate detection, investigation, prosecution, and prevention of child abuse by the governmental agencies charged with those responsibilities. Its purpose is certainly not to require, much less immunize, the general dissemination of allegations of child abuse, one of the most defamatory charges that can be made against anyone.

The scope of the immunity granted by section –510 is consonant with this scheme. For immunity to attach, two conditions must exist. First, there must be a "report ... pursuant to this part," i.e., a report made in accordance with section –503, to "the nearest peace officer, law enforcement agency, or office of the division [of Family Services]." Utah Code Ann. § 62A–4–503 (1989).[5] Second, the report must have been made in good faith. Utah Code Ann. § 62A–4–510 (1989).

Addressing the first requirement, defendants argue that the letter sent to the mayor of Murray City qualifies as a "report" under section –503 because it was sent to a "peace officer" or to a "law enforcement agency." While the mayor may be considered a general supervisor of police, that does not make him "the nearest peace officer [or] law enforcement agency," and there is no suggestion that Ms. Rasmussen thought he, or any of the others to whom the letters were sent, fell within that category. Because the letters and reports were sent to persons other

---

4. Section 62A–4–101 defines "Division," as used in section 62A–4–503, as the "Division of Family Services." Utah Code Ann. § 62A–4–101(6) (1989 & Supp.1990).

5. The court is aware of no case law from other jurisdictions holding specifically that a report is not immune because it was not made to proper authorities under a similar statute. Many courts, however, have implicitly endorsed this view by finding good faith, and thus immunity, under similar statutes only after stating that the report was made to the proper authorities as outlined in the relevant statute. *See, e.g., Davis v. Durham City Schools,* 91 N.C.App. 520, 372 S.E.2d 318 (1988) (school principal's report concerning teacher's physical abuse of children to department of social services held immune under statute providing immunity for good faith reports to "department of social services"); *Kempster v. Child Protective Services of Dep't of Social Servs.,* 130 A.D.2d 623, 515 N.Y.S.2d 807 (1987) (report to child protective services privileged because there was reasonable cause and good faith); *Gross v. Haight,* 496 So.2d 1225 (La.Ct.App.1986) (only persons contacted other than doctors were those necessary to the investigation); *McDonald v. State,* 71 Or.App. 751, 694 P.2d 569 (1985) (report to child services division protected as per statute because made in good faith).

than those mentioned in section –503, none qualify as a "report pursuant to" the statute. Therefore, defendants are not entitled to immunity under the statute.

Having concluded that the reports in question could not be required by section –503, we need not address the question of whether defendants satisfy the other element required for section –510 immunity—good faith.

■ We next consider the trial court's ruling that the letters and reports sent to Commissioner Peuler and to Mr. Price, the father's counsel were eligible for common law immunity as statements made in the course of participation in a judicial proceeding. With respect to defamation claims, it is true that the common law recognizes that "conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation." W. Prosser & P. Keeton, *The Law of Torts* § 114 (5th ed. 1984) (footnote omitted). This protection from liability, referred to as a "privilege," comes in two forms: one is termed "absolute," and the other, "conditional" or "qualified." [6]

Absolute privileges are granted to persons whose special position or status requires that they be as free as possible from fear that their actions in their position might subject them to legal action.[7] Restatement (Second) of Torts ch. 25, topic 2, title B, *Absolute Privilege Irrespective of Consent,* at 242–43 (1977). One of the absolute privileges is that granted to participants in judicial proceedings. The general rule is that judges, jurors, witnesses, litigants, and counsel in judicial proceedings have an absolute privilege against defamation. *See* 50 Am.Jur.2d *Libel & Slander* § 231 (1970); W. Prosser & P. Keeton, *supra,* § 114. This privilege is premised on the assumption that the integrity of the judicial system requires that there be free and open expression by all participants and that this will only occur if they are not inhibited by the risk of subsequent defamation suits. *See* 50 Am.Jur.2d *Libel & Slander* § 231 (1970).

The scope of a witness's absolute privilege to defame in connection with a judicial proceeding is addressed by the Restatement. It provides:

> A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.

Restatement (Second) of Torts § 588 (1977); *see also Green Acres Trust v. London,* 141 Ariz. 609, 688 P.2d 617 (1984); *Ducosin v. Mott,* 292 Or. 764, 642 P.2d 1168 (1982); *McNeal v. Allen,* 95 Wash.2d 265, 621 P.2d 1285 (1980).

This court first considered the privilege in *Beezley v. Hansen,* 4 Utah 2d 64, 286 P.2d 1057 (1955). In *Beezley,* the husband in a divorce proceeding sued his wife's father on two counts of defamation. Both the husband and the wife's father were attorneys. The wife sought her father's advice concerning her divorce, although she had another attorney of record. The first count of defamation arose from statements the father made during private legal consultation with the wife. The father told his

---

**6.** Some courts have recognized a qualified privilege for defamation in various circumstances. *See generally* W. Prosser & P. Keeton, *The Law of Torts* § 115 (5th ed. 1984). The trial court, in this case, did not recognize any such common law privilege, and the parties did not brief the issue on appeal. Therefore, we do not consider whether such a privilege is available under the facts of this case.

**7.** On the other hand, as stated by the Missouri Supreme Court: " 'The class of occasions where the publication of defamatory matter is absolutely privileged is confined within narrow limits to cases in which the public service or the administration of justice requires complete immunity to account for language used.' " *Pulliam v. Bond,* 406 S.W.2d 635, 640 (Mo.1966) (quoting 53 C.J.S. *Libel & Slander* § 102 (currently § 69 (1987))).

daughter that her husband "was not fair and honest with her." *Id.* at 65, 286 P.2d at 1057. The second count alleged that the father·had repeated the defamatory statement during his deposition in the divorce proceedings. He was being deposed by the husband's counsel at the time. *Id.,* 286 P.2d at 1057.

The court explained that because at the time of the first statement there existed an attorney-client relationship between the father and daughter, that statement was absolutely privileged. *Id.,* 286 P.2d at 1057–58. The court also considered the statement made during the deposition to be nonactionable. Quoting from the Restatement of the Law of Torts, the court noted, "Had this statement been made by [the father] as a witness at the actual trial there could be no claim that it would not be absolutely privileged." *Id.,* at 66, 286 P.2d at 1058 (citations omitted). The court held that this "same reasoning should apply to answers given by a witness in a deposition." *Id.* at 67, 286 P.2d at 1058. The court affirmed the trial court's grant of summary judgment for the father.

This court again considered the privilege in *Wright v. Lawson,* 530 P.2d 823 (Utah 1975). In *Wright,* a lawyer had been sued for defamation by one who was mentioned in a letter the lawyer sent to stockholders of a corporation during the course of a struggle for control. The letter detailed the conduct of a shareholders' meeting and stated that the conduct of the plaintiff and others at that meeting was "opposed to good morals and against public policy," had denied the lawyer's clients their right to vote, and was designed to perpetuate the plaintiff and others in office. The letter

further recited that the lawyer represented his clients in a suit against the defendant and others for violation of the corporation laws of Utah and threatened action if the lawyer's clients' demands were not met. *Wright,* 530 P.2d at 825. The lawyer claimed that the letter was absolutely privileged because it mentioned a pending suit and referred to possible future litigation. The trial court agreed and dismissed the action.

The *Wright* opinion first noted that most American courts have given a narrower construction to the privilege than have the courts in England, where the privilege arose. It then "adopt[ed] a rule that [in order for the privilege to apply] the statement alleged to be libelous must have some relationship to the cause or subject matter involved." *Id.* (footnote omitted). The court held that the letter's mention of a pending lawsuit or its threat to commence litigation had "no sufficient relationship to pending or anticipated litigation" to entitle any defamatory material in the letter to an absolute privilege. *Id.* at 826.[8] The case was remanded for trial.

Neither in *Wright* nor in *Beezley* did we have occasion to elaborate on the elements of the cause of action. It can usefully be broken down into the following three elements, all of which must be satisfied for the privilege to apply. First, the statement must have been made during or in the course of a judicial proceeding.[9] Second, the statement must have some reference to the subject matter of the proceeding. *See Wright,* 530 P.2d at 825. Finally, the one claiming the privilege must have been acting in the capacity of a judge, juror, witness, litigant, or counsel in the proceeding

**8.** The Restatement provides that the testimony need not be material or even relevant so long as it has "some reference to the subject of the litigation." Restatement (Second) of Torts § 588, comment (c) (1977). Most courts hold that the defamatory material need not be relevant as an evidentiary matter, but need only have "some relation" to the proceeding. *See, e.g., Circus Circus Hotels, Inc. v. Witherspoon,* 99 Nev. 56, 657 P.2d 101 (1983). We read this court's language in *Wright v. Lawson,* 530 P.2d 823 (Utah 1975), as implying, if not expressing,

the same meaning. The determination of whether the communication has sufficient reference to the subject matter of the litigation is a question of law. *See Wright,* 530 P.2d at 825–26.

**9.** For a discussion of the broad interpretation generally given this element, see W. Prosser & P. Keeton, *supra,* § 114; 50 Am.Jur.2d *Libel & Slander* § 232 (1970).

at the time of the alleged defamation. *See* 50 Am.Jur.2d *Libel & Slander* § 231 (1970); *cf. Wright*, 530 P.2d at 825.

■ We now analyze the facts of the present case. There is no need for us to determine whether the first and second elements of the privilege are met. Rasmussen argues that in sending the second and third letters, she was acting as a potential witness in the custody modification proceeding. We conclude as a matter of law that she was not. Therefore, neither she nor any of the other defendants can satisfy the third element.

There is no wooden formula for determining who qualifies as a "witness." However, we conclude that one does not qualify as a witness simply because one has sufficient expertise or knowledge of the underlying facts to be of some potential benefit to a party or the court if called as a witness. If this were the law, then anyone with such expertise or information could, on his or her own initiative, direct libelous communications to a participant or decision maker in a litigation with impunity. The integrity of the judicial system—the underlying justification for the absolute privilege—does not demand such license. Here, nothing in the record suggests that Rasmussen was designated as an actual or prospective witness in the custody proceeding, and nothing suggests that Mr. Price or Commissioner Peuler requested her opinion concerning the possible abuse of M.[10]

Because Rasmussen was not a witness at the time she sent the second and third letters, neither she nor any of the other defendants whose liability is dependent upon hers is entitled to claim the common law privilege.

■ Finally, we address defendants' argument that the statute of limitations has run on the first letter, which Rasmussen

sent to the mayor of Murray City. The code provides a one-year statute of limitations for libel actions. *See* Utah Code Ann. § 78–12–29(4) (1987 & Supp.1990). It is undisputed that more than one year had run between the time of publication of the first letter and the time the action was commenced. This fact alone, however, is not necessarily dispositive.

Although the general rule is that a statute of limitations in tort begins to run when all of the elements of the tort have occurred, *see Davidson Lumber Sales v. Bonneville Inv., Inc.*, 794 P.2d 11, 19 (Utah 1990), there are situtations where, for equitable reasons, we have held that a statute does not run until the plaintiff knows or has reason to know that he or she has a cause of action, *see, e.g., Christiansen v. Rees*, 20 Utah 2d 199, 436 P.2d 435 (1968) (surgical needle in abdomen not discovered for ten years); *Foil v. Ballinger*, 601 P.2d 144 (Utah 1979) (plaintiff aware of injury but not of negligent cause).

There is a split of authority among state courts concerning whether a "discovery rule" ought to apply in defamation cases. While a number have held that a statute of limitations should run from when the plaintiff knew or should have known of the cause of action, *see Clark v. Airesearch Mfg. Co. Div. of Garrett Corp.*, 138 Ariz. 240, 673 P.2d 984 (Ariz.Ct.App.1983); *Manguso v. Oceanside Unified School Dist.*, 88 Cal.App.3d 725, 152 Cal.Rptr. 27 (1979); *Hoke v. Paul*, 65 Haw. 478, 653 P.2d 1155 (1982); *Jones v. Pinkerton's Inc.*, 700 S.W.2d 456 (Mo.Ct.App.1985), others have adhered to the traditional rule without regard to the equities, *see Lathrop v. McBride*, 209 Neb. 351, 307 N.W.2d 804 (1981); *Mikaelian v. Drug Abuse Unit*, 501 A.2d 721 (R.I.1985).

We think that the policy behind the discovery rule, that potential plaintiffs should

---

**10.** We are not holding here that one who gives testimony voluntarily cannot qualify as a witness. In fact, many cases hold that voluntarily given testimony is still privileged. However, these cases generally involve testimony *actually* given *in court* that is not a direct response to questions. *See, e.g., O'Barr v. Feist*, 292 Ala. 440, 296 So.2d 152 (1974) (relevant testimony given voluntarily and not in response to questions still privileged).

not be barred from suit if they did not know and could not reasonably have known of the underlying facts giving rise to a cause of action, appropriately applies to libel actions. Unlike cases involving direct injury to the person, a libel may remain unknown for years, all the while having its effect on one's reputation. We therefore hold that in libel cases, the one-year period of section 78–12–29(4) does not begin to run until the libel is known or is reasonably discoverable by the plaintiff. Whether plaintiffs knew or should have known of the letter to the mayor is a question of fact to be determined on remand.

We reverse the trial court's grant of summary judgment and remand for further proceedings consistent with this opinion.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.